[Civ. No. 23894. First Dist., Div. One. June 30, 1967.]

BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, Plaintiff and Appellant, v. ALAN CRANSTON, as State Controller, etc., Defendant and Respondent.

Samuel B. Stewart, Charles E. Cooper, Theodore Sachsman and Thomas E. Montgomery for Plaintiff and Appellant.

Thomas C. Lynch, Attorney General, Ernest P. Goodman, Assistant Attorney General, and John E. Barsell, Jr., Deputy Attorney General, for Defendant and Respondent.

ELKINGTON, J.—Bank of America National Trust and Savings Association, plaintiff below, which we shall call the Bank, appeals from a declaratory judgment in favor of respondent Controller of California.

The judgment relates to the rights of the parties under the Uniform Disposition of Unclaimed Property Act, herein called the act. The act, which was enacted as sections 1500-1527, Code of Civil Procedure,[1] became effective September 18, 1959. Its nature and purpose were succinctly set forth in *Douglas Aircraft Co.* v. *Cranston* (1962) 58 Cal.2d 462, 463 [24 Cal.Rptr. 851, 374 P.2d 819, 98 A.L.R.2d 298], as: "The act defines abandoned property (§§ 1502-1508) and requires that its holder shall report (§ 1510) and pay or deliver it to the State Controller (§ 1512). The statute of limitations is not a defense to such reporting and payment or delivery (§ 1515), and the act applies to property that was abandoned before it took effect (§ 1510, subd. (g)). It provides for notice to the owner by publication and otherwise (§§ 1510, subd. (e), 1511). The owner may appear at any time and claim the property from the Controller after it has been delivered to him (§§ 1517-1520). Delivery to the Controller is a defense to any action by the owner against the holder. (§ 1513.) The objectives of the act are to protect unknown owners by locating them and restoring their property to them and to give the state rather than the holders of unclaimed property the benefit of the use of it, most of which experience shows will never be claimed."

█ The Controller's rights under the act are derivative. He succeeds, subject to the act's provisions, to whatever rights the owners of the abandoned property may have. In *State* v. *Standard Oil Co.* (1950) 5 N.J. 281, 298 [74 A.2d 565] (cited in *Douglas Aircraft Co.* v. *Cranston, supra*) where a similar statute was concerned, it is stated: "The State's right is purely derivative; it takes only the interest of the unknown or absentee owner." (See also *Barker* v. *Leggett*, 102 F.Supp. 642, 644-645; *Application of People of the State of New York*, 138 F.Supp. 661, 666; *Southern Pac. Transport Co.* v. *State* (Tex.Civ.App.) 380 S.W.2d 123, 126.)

[1]Statutory references herein are to Code of Civil Procedure unless otherwise specified.

Sections 1502 and 1504 presume to be abandoned property, sums payable by banks on bank drafts, cashier's checks, certified checks, money orders and Christmas club checks that have been outstanding for more than seven years, any corporate dividends remaining unclaimed after seven years, and sums payable on traveler's checks that have been outstanding for more than 15 years. Collectively, we shall call these obligations "Items."[2]

The Bank did not report or pay over to the Controller the amount payable on any of the items as to which it had become obligated before September 18, 1955. Instead in 1960, it filed the instant declaratory relief action urging that the act, insofar as it purported to deny to the Bank the benefit of the four-year statute of limitations (§ 337, subd. 1) as to the Items in question, was invalid.

On pretrial proceedings, the Bank relied upon *Douglas Aircraft Co.* v. *Cranston, supra,* 58 Cal.2d 462. That case holds squarely that the act does not apply to presumed abandoned property on which the statute of limitations had run on the effective date of the act.

At the start of the trial the Bank withdrew its statute of limitations contention insofar as it related to traveler's checks. Counsel indicated recent information had disclosed Bank advertising in several languages, to the effect that there was no time limitation within which its traveler's checks must be presented.

The Bank then offered an alternative theory as to traveler's checks. It presented evidence that each purchaser of such checks signed an agreement that he would in case of loss or theft immediately notify the Bank, which would not be obligated to make refund on such lost or stolen checks if such immediate notice was not given. The Bank then argued it must be presumed that any traveler's check outstanding for more than four years is lost or stolen; that the Bank under the contract is not obligated to redeem such presumed lost or stolen traveler's checks; and that if there is no obligation to the check's purchaser, there is also no obligation to comply with the act.

The trial court determined that all of the Items were entrusted funds held by the Bank in a fiduciary capacity, on which the statute of limitations did not commence running until demand for payment was made by the persons entitled

---

[2]Commercial Code section 4104 defines "Item" as any instrument for the payment of money.

thereto.[3] The court also held there was no presumption that traveler's checks outstanding for more than four years were lost or stolen, and as to the checks in question found that none had been lost or stolen.

Judgment was entered declaring that the act applied to all of the Items at issue and ordering the Bank to report, pay and deliver the amounts of such Items to the Controller.

The appeal is from the entire judgment.

 The Bank's first contention is: *There is a presumption that if a traveler's check has been outstanding for four years, it has been lost or stolen.*

It might be pointed out that the purpose of the purchaser's agreement to make prompt report of lost or stolen traveler's checks is to protect the Bank against double liability. The act, section 1513, precludes the possibility of double payment by providing that upon payment or delivery of abandoned property to the Controller, the Bank is relieved of any further liability thereunder.

The presumption argued by the Bank is arbitrary. No authority or reasoning is offered as to why the presumption should relate to four years—rather than to some other period of time. In support of its contention the Bank urges the disputable presumptions (in effect at the time of the trial), "That the ordinary course of business has been followed" (§ 1963, subd. 20—now repealed), and, that "Things happen according to the ordinary course of nature and the ordinary habits of life" (§ 1963, subd. 28—now Civ. Code, § 3546). It is contended, applying these presumptions, that a person who knows he holds a traveler's check will present it for payment within four years from the time he purchased it. We think a more reasonable application of these presumptions would be that a person whose traveler's checks had been lost or stolen would promptly recoup his loss by honoring his contract—and not having so reported, his traveler's checks are not presumed lost or stolen.

Here the Bank represents to prospective purchasers that there is no time limit within which its traveler's checks must be presented, and then urges the court to apply the sought for presumptions and to hold, the purchaser having failed to give prompt notice of the presumed loss or theft, that the Bank is no longer required to respect and redeem its obligation.

---

[3]Except as to dividends, the Controller does not urge the trust relationship theory of the trial court.

214

We believe the Bank's representation to purchasers of traveler's checks had the effect of a waiver of any right to repudiate the obligation thereunder for nontimely presentaton. Particularly, this is so under the circumstances here, where the Bank can in no way be prejudiced.

A forfeiture of contractual rights for which the Bank here argues is not favored. ■ In *Haserot* v. *Keller*, 67 Cal. App. 659, 669 [228 P. 383], it is stated: "[F]orfeitures are not favored in the law; and any inconsistent acts or dealings by the party claiming a forfeiture will be regarded as a waiver thereof. . . . A simple voluntary relinquishment of a right with knowledge of all the facts—an expression of intention by speech or conduct, not to demand a certain thing—is sufficient to constitute such a waiver." (See also *Churchill* v. *Kellstrom*, 58 Cal.App.2d 84, 89 [136 P.2d 602]; *Lowe* v. *Copeland*, 125 Cal.App. 315, 321 [13 P.2d 522]; *McPherson* v. *Empire Gas & Fuel Co.*, 122 Cal.App. 466, 473-474 [10 P.2d 146].)

■ It is probable that the Bank would never attempt such a forfeiture against a traveler's check purchaser, and that the point is now raised only as against the Controller.[4] If this is so the derivative nature of the Controller's rights under the act must be borne in mind.[5] If the owner of presumed abandoned property has any rights, those rights accrue in their entirety to the Controller. The Bank may not waive its contractual rights as to a purchaser of traveler's checks, and then enforce those same rights as against the State and the Controller.

■ We believe the determination of the trial court as to the nonexistence of the desired presumption was correct.

The Bank next contends: *The four-year statute of limitations (§ 337, subd. 1) is applicable to bank drafts, cashier's checks, certified checks, money orders and Christmas club checks.*

■ Contending that these obligations represent money deposited with the Bank, the Controller urges that they are not affected by any statute of limitations. He cites section 348

[4]The Bank asserted at the trial that the statute of limitations had never been asserted against a tardily presented obligation of the type we here call Item. This practice is described as Bank policy.

[5]The derivative nature of the Controller's rights under the act was recognized by the Bank (1) when it promptly withdrew its assertion of the statute of limitations against the Controller upon realizing that it had waived the statute as to the purchasers of travelers checks; and (2) in its argument that if there is no obligation to a traveler's check purchaser, there is no obligation under the act.

which provides: "To actions brought to recover money or other property deposited with any bank . . . there is no limitation."

The act, as to presumed abandoned property, distinguishes between a "demand, savings or matured time deposit" which is presumed abandoned after 15 years (§ 1502 subd. (a)), and a "sum payable on any . . . written instruments" (§ 1502 subd. (d)) which admittedly refers to the Items here at issue. Earlier abandoned property statutes made the same distinction; "deposit" was given a restricted meaning which was synonymous with "account." It seems clear that the Items with which we are here concerned are not deposits within the meaning of the act.

The Controller argues, however, that the language of section 348 "money or other property deposited" intends a meaning broad enough to cover the Items within the instant contention of the Bank. We find ourselves in agreement.

We shall first discuss the Christmas club checks. The club members make monthly payments to the Bank which mails checks for the total amount paid in, with interest, to the members around December 1st. A contract between the Bank and each member refers to the payments as "deposits" to an "account." American Jurisprudence 2d, states: "A 'Christmas club' deposit is a type of deposit made in accordance with a plan which provides for the making of regular deposits during the year and the withdrawal of the money for use at Christmas." (10 Am.Jur.2d, Banks, § 357, p. 318.)

The Bank apparently agrees that such an account is a deposit and that if the club member cannot be found and the December 1st check is returned, it continues to be a deposit. It contends, however, that if such a check is delivered in the course of the mail, but is not thereafter presented for payment, the transaction changes its identity from a deposit to a liability founded on an instrument in writing. Accordingly it urges section 337, subdivision 1.

We are unable to conclude that the mailing and nonreturn of a check for its amount changes the nature of a Christmas club deposit.

It appears to be the law that upon the certification of a check, or the issuance of a cashier's check to a depositor for the amount of a withdrawal, the funds represented thereby remain a deposit. By a rather clear analogy the Christmas club accounts and deposits here involved retain their charac-

ter as such until closed out by presentation and redemption of the check.

"The giving of a cashier's check to a depositor to cover the amount of a withdrawal is merely an acknowledgment of an indebtedness on the part of the bank to the payee of the order. The change thereby made is not in the nature of the debt, but in the evidence of it." (10 Am.Jur.2d, Banks, § 544, p. 519.) "By the certification of a check the deposit which is represented by the check ceases to stand to the credit of the depositor, and passes to the credit of the check holder, who is thereafter a depositor to that amount. . . ." (5B Michie, Banks and Banking, § 256a, p. 19; see also 9 C.J.S., Banks and Banking, § 373, pp. 789-790; *Gray* v. *First Nat. Bank of Birmingham,* 263 Ala. 361 [82 So.2d 528, 530-531]; *Marks* v. *Anchor Sav. Bank,* 252 Pa. 304 [97 A. 399, 400 L.R.A. 1916E 906]; *Dean* v. *Iowa-Des Moines Nat. Bank & Trust Co.,* 227 Iowa 1239 [281 N.W. 714, 724, 128 A.L.R. 137].)

█ We now direct our discussion to the bank drafts, cashier's checks, certified checks and money orders which are also a subject of the presently considered contention of the Bank.

Section 348 was originally enacted in 1874, at which time it contained the language, "money or other property deposited with any bank." At that period of the state's history the medium principally used by banks for the transmittal of money or credit by its customers was the certificate of deposit. By definition a bank's certificate of deposit represented money deposited in a bank.

Certificates of deposit were negotiable instruments (Civ. Code, § 3095, enacted 1872, repealed 1917). In substance and effect a banker's certificate of deposit was a promissory note of the bank payable to the payee thereof or his order (*Poorman* v. *Mills & Co.* (1868) 35 Cal. 118 [95 Am.Dec. 90]; *Brummagim* v. *Tallant* (1866) 29 Cal. 503 [89 Am.Dec. 61]; *Welton* v. *Adams & Co.* (1854) 4 Cal. 37 [60 Am.Dec. 579]). 5B Michie, Banks and Banking, *supra,* pp. 197-198, § 313 states: "A certificate of deposit is defined to be a written acknowledgment by a bank of the receipt of a sum of money on deposit which it promises to pay to the depositor, to his order, or to some other person or to his order, whereby the relation of debtor and creditor . . . is created. A certificate of deposit creates the relationship of a 'general deposit.' " (See also Black's Law Dictionary (4th ed. 1951, p. 286.)

Since the enactment of section 348, banking practices have changed. Certificates of deposits are now seldom used for

transmission of funds or credit. Other forms of a bank's written obligation to pay money are now common. Principally, these forms are the bank drafts, cashier's checks, certified checks and money orders which we are now discussing. But though the name and form are changed, the nature of the bank's obligations has not. Black's Law Dictionary (4th ed. 1951, p. 301) defining ''cashier's check'' states: ''In its legal effect, it is the same as a certificate of deposit, certified check or draft.'' American Jurisprudence 2d, Volume 10, Banks, section 590, pages 557-558, states: ''When a check is certified, it ceases to possess the character or to perform the functions of an ordinary check; it represents so much money on deposit, payable to the holder on demand. . . . The legal result of certifying a check at the request of the payee is the same as though the cash for which the check called had been paid over the counter to him, redeposited to his own credit, and a certificate of deposit therefor issued to him.'' An often cited case, *Walker* v. *Sellers*, 201 Ala. 189 [77 So. 715], states, ''As between the bank and the payee a cashier's check is, in legal effect, the same as a certificate of deposit or a certified check. [Citations.] Certainly the purpose in each case is the same, that is, to enable the holder to use the check as money; and when a check is certified it ceases to possess the character, or to perform the functions, of a check, but represents so much money on deposit, payable to the holder on demand. [Citation.] 'Such a deposit stands upon exactly the same ground as any other.' ''

The substance of a certificate of deposit and of bank drafts, cashier's checks, certified checks and money orders thus appears to be the same. Each is issued in consideration of the placing, or transfer or deposit of money or credit, in or to a bank. Each is a negotiable instrument pledging the credit of the bank to the holder. And in each case the relationship of debtor and creditor arises between the holder and the bank.

█ Rather clearly it was the intent of the Legislature in enacting section 348 that it be applied to the type of transaction for which certificates of deposits were then commonly used. That type of transaction is now consummated by means of bank drafts, cashier's checks, certified checks and money orders. █ ''The guiding star of statutory construction is the intention of the Legislature. To the end that it be correctly ascertained the statute is to be read in the light of its historical background and evident objective.'' (*H. S. Mann Corp.* v. *Moody,* 144 Cal.App.2d 310, 320 [301 P.2d 28].)

■ Additionally, it appears that banking practice generally has customarily given to "deposit" a meaning much broader than that given by the act. Statutes relating to the Federal Deposit Insurance Corporation define the term "deposit" as extending to accounts evidenced by bank drafts, cashier's checks, certified checks, money orders and certificates of deposit (12 U.S.C. § 1813). Evidence offered by the Controller indicates that the Comptroller of the Currency requires a report of "demand deposits" from all national banking associations. The demand deposits on which a report is required include certified checks, cashier's checks, money orders, outstanding traveler's checks and bank drafts. The Board of Governors of the Federal Reserve System defines the term "gross demand deposits" to cover certified checks, officer's checks,[6] and "travelers' checks sold for cash." (12 C.F.R. § 204.1(g).) The California Financial Code section 257 requires the Superintendent of Banks to include in his annual report a list by banks of all "deposits" unclaimed for more than ten years. A form in evidence at the trial, prepared by the superintendent for such reports defines "deposits" as including certified checks, bank money orders, cashier's and other officer's checks.

Finally, it might again be noted that the record before us indicates that the Bank has never throughout its corporate existence asserted the statute of limitations against a tardily presented instrument such as any of the Items here, on the theory that it was a nondeposit and therefore covered by the four-year, or any, statute of limitations.

We hold that section 348, Code of Civil Procedure, relates to the bank drafts, cashier's checks, certified checks, money orders and Christmas club checks which are part of the subject of this appeal.

■ The Bank's final contention is: *Unclaimed dividends held by the Bank are not entrusted funds held by the Bank in a fiduciary capacity.*

The record before us shows that when the Bank declares a dividend its "undivided profit account" is debited for the total amount thereof. This sum is then credited to the "reserve for dividends, common stock account." If the dividend check is delivered in the mail but never presented for payment, its funds remain in the "reserve for dividends, common stock account." If the check is returned in the mail unde-

---

[6]Officer's checks are checks signed by a bank officer and include cashier's checks, money orders and bank drafts.

livered, its funds then go into an ''unclaimed dividend account.''

The Bank places its principal reliance on *Bills* v. *Silver King Min. Co.*, 106 Cal. 9 [39 P. 43]; *Perkins* v. *Benguet Consol. Min. Co.*, 55 Cal.App.2d 720 [132 P.2d 70], and 11 Fletcher, Cyclopedia Corporations, page 1145, section 5370.

*Bills, supra,* holds that the declaration of a dividend creates a debtor-creditor relationship between the corporation and its shareholder, as to which the statute of limitations applies. *Perkins, supra,* as pertinent here, involved the application of certain statutes of the Philippine Islands. The court held a suit for dividends not to be barred by the Philippine statute. In neither of these cases does it appear that there was, as here, a segregation of funds within the corporation for the payment of dividends.

Fletcher, Cyclopedia Corporations, *supra,* volume 11, section 5370, page 1145, upholds the Bank's position with this language: ''Since the relation between a corporation and a stockholder with respect to his share of a dividend which has been declared by the corporation is that of debtor and creditor merely, and not that of trustee and cestui que trust, the statute of limitations runs against an action by a stockholder to recover his share in a dividend which has been declared, . . .'' Fletcher cites eight cases in support of this statement, including *Bills* v. *Silver King Min. Co., supra,* 106 Cal. 9, which we have already discussed. The remaining authorities cited do not appear to support the quoted text. We shall discuss these individually.

*Mountain Water Works Constr. Co.* v. *Holmes,* 49 Colo. 412, 439 [113 P. 501, 510], squarely states: ''A corporation is a trustee for its stockholders, and is bound to protect their interests. [Citation.] It holds its property as trustee for its stockholders.'' It does not hold that any different relationship exists as to dividends. *Redhead* v. *Iowa Nat. Bank,* 127 Iowa 572 [103 N.W. 796, 797] holds squarely that dividends were held by the defendant bank ''in trust for the stockholder.'' In *Winchester & Lexington Turnpike Co.* v. *Wickliffe's Admr.,* 100 Ky 531, 534 [38 S.W. 866, 867, 66 Am.St. Rep. 356], the court noted the appellant's contention '' 'A bank is a trustee for its stockholders' '' but found it unnecessary to pass upon the point to reach its decision. In *Seymour* v. *Mechanics & Metals Nat. Bank,* 199 App. Div. 707 [192 N.Y.S. 588, 595], where the plaintiff pleaded, among

other things, that the bank was obligated to account for dividends received and thereby it became a trustee for the stockholders of the original bank, it was held a cause of action was stated. From a reading of *Baillie* v. *Columbia Gold Min Co.*, 86 Ore. 1 [166 P. 965 and 167 P. 1167], we find no support for Fletcher's quoted text. Finally, *Hunt* v. *O'Shea*, 69 N.H. 600 [45 A. 480, 50 L.R.A. 160] and *Jaques* v. *White Knob Copper & Dev. Co.*, 260 App. Div. 640 [23 N.Y.S.2d 326, 328-329], are authority for the proposition that simply declaring a dividend does not create a trust fund; to create such a fund some specific sum of money must be set aside for that purpose.

The Controller urges with regards to dividends, that a trust relationship exists between the Bank and its shareholders and that at least until demand for his dividends by the shareholder, and refusal by the Bank, no statute of limitations applies.

It is, of course, settled that the statute of limitations never begins to run in favor of a trustee until the trustee repudiates the trust. (*Wight* v. *Rohlffs*, 9 Cal.2d 620 [72 P.2d 142]; *Cortelyou* v. *Imperial Land Co.*, 166 Cal. 14 [134 P. 981]; *Briggs* v. *Nilson*, 226 Cal.App.2d 342, 347 [38 Cal.Rptr. 68]; *Mulli* v. *Mulli*, 105 Cal.App.2d 68, 74 [232 P.2d 556].)

We need not pass upon the question as to whether, as contended by the Controller, the mere declaration of a dividend creates a trust relationship between the Bank and its shareholders. Here we have something more. Upon declaration of a dividend the Bank segregates a fund for its payment and places it in a special account. Where this is done, it seems to be the rule that the dividend fund is a trust fund held by the corporation as trustee for its shareholders.

*In re Interborough Consol. Corp.* (1923) 288 F. 334, 341 [32 A.L.R. 932], is a leading case supporting this rule. There it is stated: "The law is established that where a corporation has not only declared a dividend, but has specifically appropriated and set apart from its other assets a fund out of which the dividend is to be paid, such action constitutes the assets so set apart a trust fund in the hands of the corporation for payment of the stockholders, to the exclusion of other creditors."

More recently the Supreme Court of New Jersey in *State* v. *Standard Oil Co.* (1950) *supra*, 5 N.J. 281, 302-303 [74 A.2d 565, 575] held: "The trust fund theory is a more realistic concept of the substance of the transaction here and the relationship between the parties than that of a mere debt within

the operation of the statute of limitations. There was a segregation from the company's funds of the moneys to be devoted to the payment of the dividends. The mere declaration of a dividend by a corporation gives rise to a debt as against it in favor of the individual stockholders; but where 'the fund for its payment has been actually set apart and distinguished from the general mass of the company's funds, the fund so set apart becomes a trust fund for the payment of the dividend, which cannot be reached by the general creditors of the corporation, and when it becomes a trust fund for the payment of dividends it cannot be diverted and used for any other purpose.'

" . . . . . . . . . . . . .

"It results that the [statute of limitations is] not operative to extinguish the stockholders' right to the dividends in question."

Other authorities asserting this rule are *McLaran* v. *Crescent Planing Mill Co.*, 117 Mo.App. 40 [93 S.W. 819]; *In re Associated Gas & Elec. Co.*, 137 F.2d 607, 610; *Elkins* v. *First Nat. Bank*, 43 F.2d 777, 779; *Van Dyke* v. *McQuade*, 86 N.Y. 38; *Le Roy* v. *Globe Ins. Co.*, 2 Edw. Ch. (N.Y.) 657; *Matter of Le Blanc*, 14 Hun. 8; 32 A.L.R. 950, 971).

We conclude that the statute of limitations does not bar the Controller from taking, under the act, the unclaimed dividends here in question.

There is no substantial controversy as to the facts established at the trial. We are satisfied that the judgment of the trial court is correct even though its stated grounds differ in part from those relied upon by this court. "[A] ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason." (*Davey* v. *Southern Pac. Co.*, 116 Cal. 325, 329 [48 P. 117]; see also *International etc. Workers* v. *Landowitz*, 20 Cal.2d 418, 423 [126 P.2d 609]; *El Centro Grain Co.* v. *Bank of Italy*, 123 Cal.App. 564, 567 [11 P.2d 650].)

Judgment affirmed.

Molinari, P. J., and Sims, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 27, 1967. Mosk, J., did not participate therein.