[Civ. No. 54267. Second Dist., Div. Three. July 25, 1979.]

KENNETH CORY, as State Controller, Plaintiff and Respondent, v. GOLDEN STATE BANK, Defendant and Appellant.

**COUNSEL**

Hartman, Hosp, Richard & Schlegel, Monte D. Richard, Stanford E. Reichert and Richard J. Schlegel for Defendant and Appellant.

George Deukmejian, Attorney General, Warren J. Abbott, Assistant Attorney General, and Yeoryios C. Apallas, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**KLEIN, P. J.**—On April 17, 1975, the Controller of the State of California (hereinafter Cory) instituted this action against Golden State Bank (hereinafter the Bank), seeking to recover certain funds held by the Bank as the result of money orders remaining uncashed for more than seven years. The first of Cory's seven causes of action was based on the Unclaimed Property Law (Code Civ. Proc., § 1500 et seq.) and in particular Code of Civil Procedure section 1513, which at that time provided as follows:

"Subject to Sections 1510 and 1511, the following property held or owing by a business association escheats to this state:

"⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅

"(d) Any sum payable on any other written instrument on which a banking or financial organization is directly liable, including, by way of illustration but not of limitation, any . . . money order, that has been outstanding for more than seven years from the date it was payable, or from the date of its issuance if payable on demand, *excluding any charges that may lawfully be withheld,* when the owner, for more than seven years, has not corresponded in writing with the banking or financial organization concerning it, or otherwise indicated an interest as evidenced by a memorandum or other record on file with the banking or financial organization.

"⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅

(Italics added.)[1]

---

[1]We note that the phrase "excluding any charges that may lawfully be withheld" was removed from Code of Civil Procedure section 1513, subdivision (d) by an amendment

Relying on the italicized portion of the above quoted language, the Bank asserted as an affirmative defense that it was entitled to retain, from a total uncashed money order fund of $154,765.47, service charges in the amount of $143,133.22.

On June 22, 1977, the trial court, Judge Robert I. Weil presiding, granted a motion by Cory for summary judgment as to the first cause of action, finding that the service charges sought to be retained by the Bank were not, under Code of Civil Procedure section 1513, subdivision (d), the kind of "charges that may lawfully be withheld." Cory thereupon dismissed his remaining six causes of action and, on October 21, 1977, judgment in Cory's favor on the first cause of action was entered, Judge Jack T. Ryburn presiding.

The Bank now appeals, contending that triable issues of material fact remain regarding the Bank's right to deduct service charges with respect to uncashed money orders. For the reasons discussed below, we find the Bank's arguments unconvincing and, therefore, affirm the judgment of the trial court.

FACTS

Through the use of requests for admissions and other discovery techniques, Cory established the following to be the Bank's practice with respect to the sale of money orders:

The money orders used by the Bank come in three parts initially, all attached at one end. The first part is the actual money order or face copy; the second part, lying beneath the first, is the customer's copy; the third

---

effective January 1, 1976. (Stats. 1975, ch. 578, § 1, p. 1158.) At the same time, section 1522 was added to the Code of Civil Procedure, providing as follows: "No service, handling, maintenance or other charge or fee of any kind may be deducted or withheld from any property subject to escheat under this chapter, unless specifically permitted by this chapter.

"Even when specifically permitted by this chapter, such charges or fees may not be excluded, withheld or deducted from property subject to this chapter if, under its policy or procedure, the holder would not have excluded, withheld or deducted such charges or fees in the event the property had been claimed by the owner prior to being reported or remitted to the State Controller." (Stats. 1975, ch. 578, § 3, pp. 1159-1160.)

part, lying beneath the first two, is the Bank's copy.[2] When a customer purchases a money order, the face amount plus an issuance fee is collected by the Bank's agent. The agent then imprints the money order, detaches and retains the Bank's copy, and hands the customer the money order itself with the customer's copy or receipt still lying beneath it.

The provision which the Bank maintains is legally sufficient to justify its withholding of service charges is found on the customer's copy in small print. The provision reads: "The check described hereon will be subject to a service charge from the date of issuance if not presented for payment to this bank within one year from such date." During the sale of the money order, the Bank's agent does not inform the customer of this provision. Accordingly, the first opportunity the customer has to become aware of the service charge provision is when he or she is handed the customer's copy or receipt after the sale has already taken place.

Pursuant to the service charge provision, the Bank has instituted a practice of deducting charges from the sums payable on uncashed money orders. At least with respect to the recent past, the practice was to charge off and credit to income on the Bank's books the entire amount of any

[2]Examples of the face and customer copies follow:

money order which was for $63 or less and which had remained outstanding for four years. If the face amount exceeded $63, the item remained on the Bank's list of outstanding money orders until it became seven years old, at which time a $63 charge was taken against the issued amount. The remainder was reported to the state as unclaimed property.

During the period covered by Cory's complaint, namely from the beginning of 1958 through June 1967, the Bank reported only $11,632.25 as unclaimed property. The amount withheld as service charges by the Bank represents 92.48 percent of the unclaimed total.

## DISCUSSION

■ We begin our discussion by acknowledging that summary judgment is a drastic procedure which should be used with caution so that it does not become a substitute for the normal trial method of determining facts. (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 852 [94 Cal.Rptr. 785, 484 P.2d 953]; *People* ex. rel. *Dept. Pub. Wks.* v. *McNamara Corp. Ltd.* (1972) 28 Cal.App.3d 641, 651-652 [104 Cal.Rptr. 822].) On the other hand, "[w]hen discovery, properly used, makes it 'perfectly plain that there is no substantial issue to be tried' [citation], section 437c, Code of Civil Procedure, is available for prompt disposition of the case." (*Buffalo Arms, Inc.* v. *Remler Co.* (1960) 179 Cal.App.2d 700, 703 [4 Cal.Rptr. 103].) Furthermore, it is clear that the nonmoving party's admissions may be used to establish that no material factual issues remain to be resolved by trial. (See *Newport* v. *City of Los Angeles* (1960) 184 Cal.App.2d 229, 236 [7 Cal.Rptr. 497].)

Here the admissions and other competent evidence set forth in Cory's moving papers adequately demonstrated that the Bank was not, as a matter of law, legally entitled to withhold service charges under any of its theories, contractual or statutory.

■ First, notwithstanding the Bank's arguments to the contrary, no factual issues remain as to whether a valid contract for service charges can be said to exist between the Bank and each of its money order customers. ■ The rule is well established in this state that "an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." (*Windsor Mills, Inc.* v. *Collins & Aikman Corp.* (1972) 25 Cal.App.3d 987, 993 [101 Cal.Rptr. 347]; cf. *Steven* v. *Fidelity & Casualty Co.* (1962) 58

Cal.2d 862, 881 [27 Cal.Rptr. 172, 377 P.2d 284].) ■ In view of the undisputed evidence concerning the Bank's practice with respect to the sale of money orders, there can be no argument here that purchasers have been given an adequate opportunity to become aware of and consent to the service charge provision in the subject money orders. Rather, the uncontradicted evidence presented with Cory's summary judgment motion established that the provision in question is effectively hidden from the view of money order purchasers until after the transactions are completed. In addition, given the size of the print with which the service charge provision is set forth in the money order and the fact that the Bank's agents do not as a rule call the provision to the customer's attention, it would be reasonable to presume that most customers never, in fact, become aware of the provision's existence. Under these circumstances, it must be concluded that the Bank's money order purchasers are not chargeable with either actual or constructive notice of the service charge prõvision, and therefore cannot be deemed to have consented to the provision as part of their transaction with the Bank.

■ We next turn to the Bank's contention that it is entitled to impose a service charge on uncashed money orders by virtue of the warehouseman's lien provision of Financial Code section 1670. That section reads: "Whenever a bank receives personal property for safekeeping or storage as bailee and issues a receipt therefor, the bank may enforce its lien as warehouseman in accordance with the provisions of the Uniform Commercial Code or at its option in the manner provided in Sections 1671 to 1673, inclusive, of this article."

■ It is a cardinal rule of construction that statutes should be given a reasonable interpretation which accords with the apparent intent of the Legislature. (*County of Alameda* v. *Kuchel* (1948) 32 Cal.2d 193, 199 [195 P.2d 17]; see also *Rushing* v. *Powell* (1976) 61 Cal.App.3d 597, 603-604 [130 Cal.Rptr. 110].) The construction given to a statute should not be one which would lead to absurd results or results not contemplated by the Legislature. (*Younger* v. *Superior Court* (1978) 21 Cal.3d 102, 113 [145 Cal.Rptr. 674, 577 P.2d 1014].)

To apply Financial Code section 1670 to the uncashed money order fund in question here would, however, lead to unreasonable or absurd results in terms of the remedies referred to in the statute.

■ First, California Uniform Commercial Code section 7210, which sets forth one of the enforcement procedures mentioned in Financial

Code section 1670, specifically refers to the pertinent liens as being on "goods."[3] The funds retained by the Bank with reference to the uncashed money orders, however, cannot be deemed "goods" within the meaning of this enforcement statute since California Uniform Commercial Code section 2105, subdivision (1), which defines the term "goods," explicitly excludes money used to pay the price of something from its definition. Indeed, the Official Comment to section 2105 states: "Goods is intended to cover the sale of money when money is being treated as a commodity but not to include it when money is the medium of payment." (See also *In re Midas Coin Company* (E.D.Mo. 1967) 264 F.Supp. 193, 197.)

Secondly, it would obviously be impossible to hold a lien sale of the uncashed money order funds held by the Bank, as is contemplated by the enforcement procedures set forth in both California Uniform Commercial Code section 7210 (fn. 3, *ante*) and sections 1671 to 1673 of the Financial Code,[4] the latter constituting the alternative enforcement remedy provided for in Financial Code section 1670.

We note lastly on this point that Financial Code section 1670, by its terms, applies only to property received by a bank "as bailee." It is well established, however, that a bank which receives a general deposit is not a bailee of that deposit. (5A Michie on Banks and Banking (1973 rev.) ch. 9, § 1, pp. 8-9.) Nothing in the record before us suggests that the money received from the purchase of money orders has ever been treated by the Bank as anything other than a general deposit.

■ We also find no merit in the Bank's contention that it is entitled to service charge uncashed money orders by virtue of the banker's lien provided for in Civil Code section 3054, subdivision (a), which reads: "A banker has a general lien, dependent on possession, upon all property in his hands belonging to a customer, for the balance due to him from such customer in the course of the business."

---

[3]For example, California Uniform Commercial Code section 7210, subdivision (1) states in part: "[A] warehouseman's lien may be enforced by public or private sale of the *goods* in bloc or in parcels, at any time or place and on any terms which are commercially reasonable, after notifying all persons known to claim an interest in the goods. . . ."

[4]Financial Code section 1671 provides for the sale of property held by a bank in the following terms: "If the amount charged by a bank for the safekeeping or storage of personal property is not paid within six months from the day it is due, the bank, at any time thereafter and while such charges remain unpaid, may mail a notice to the person in whose name the receipt was issued, giving the amount then due for such safekeeping or storage and stating that unless such amount and any other charges accruing to the date of payment are paid, the bank will sell such personal property at a time and place named therein, which time shall be at least 30 days after the mailing of such notice. . . ."

An implicit requirement for the application of this subdivision is that there be some indebtedness running from the customer to the banker. (See *Bromberg* v. *Bank of America* (1943) 58 Cal.App.2d 1, 6-7 [135 P.2d 689].) Yet the effect of a bank money order purchase is to make the bank a debtor by creating an obligation on its part to honor the designated payee's demand for payment. (See 10 Am.Jur.2d, Banks, § 545, p. 520; 6 Michie on Banks and Banking (1975 rev.) ch. 12, § 13, p. 362.) Furthermore, since it appears that in such a debtor-creditor relationship the bank becomes the legal owner of the funds deposited in payment of the money order, it cannot technically even obtain a lien over the funds. (See *Kruger* v. *Wells Fargo Bank* (1974) 11 Cal.3d 352, 357 [113 Cal.Rptr. 449, 521 P.2d 441, 65 A.L.R.3d 1266].)

Likewise, the exercise of any equitable right of setoff possessed by the Bank would require that there first exist some matured debt owed to the Bank against which the setoff could be applied. (*Crocker-Citizens Nat. Bank* v. *Control Metals Corp.* (9th Cir. 1977) 566 F.2d 631, 637.) The Bank appears to argue in this regard that the service charge itself can supply the necessary indebtedness which would allow the Bank to exercise its right of setoff. In addition to the defect of being obviously circular, such argument also suffers from its reliance on an assumption which we have already decided is untenable, namely, that a contractual obligation to pay a service charge comes into existence when a money order is purchased.

■ We note finally that even if it is assumed, for sake of argument, that the service charge provision appearing on the Bank's money orders does create some sort of contractual obligation or indebtedness owing to the Bank, the Bank would nonetheless be estopped from claiming the right to withhold the funds in question from Cory by virtue of an admission it made during discovery to the effect that it does not, in general, seek to enforce the service charge provision against members of the public. "The Bank may not waive its contractual rights as to a purchaser . . . , and then enforce those same rights as against the State and the Controller." (*Bank of America* v. *Cranston* (1967) 252 Cal.App.2d 208, 214 [60 Cal.Rptr. 336].)

The judgment is affirmed.

Allport, J., and Potter, J., concurred.

A petition for a rehearing was denied August 23, 1979, and appellant's petition for a hearing by the Supreme Court was denied September 20, 1979.