[Civ. No. 15421. Third Dist. Mar. 14, 1978.]

JANET FARLEY, Plaintiff and Appellant, v.
KENNETH CORY, as State Controller,
Defendant and Respondent.

[Civ. No. 15422. Third Dist. Mar. 14, 1978.]

MARGARET SLETTLAND et al., Plaintiffs and Appellants, v.
KENNETH CORY, as State Controller,
Defendant and Respondent.

584

**COUNSEL**

Gary J. Near and Neil Gendel for Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, Warren J. Abbott, Assistant Attorney General, and G. A. Strader, Deputy Attorney General, for Defendant and Respondent.

**OPINION**

**REYNOSO, J.**—We consider whether taxpayers have standing to sue the Controller, a state official, for mandatory injunctive and declaratory relief seeking to compel his exercise of discretion. We hold only that the taxpayers have standing. On the record before us, we conclude that the affirmative relief sought, if appropriate, must await a full hearing before the trial court. We reverse and remand.

*Proceedings Below*

In the first of the two consolidated cases, plaintiffs (Slettland and Kerner) filed a taxpayers' suit for injunctive and declaratory relief in the superior court alleging three causes of action based on bank practices related to interest and service charges. The first cause of action alleged that the State Controller (Houston Flournoy) failed properly to perform the duties of his office pursuant to the Unclaimed Property Law (Code Civ. Proc., § 1500 et seq.) in allowing banking organizations to deduct service charges and to cease payment of interest on dormant accounts which eventually "escheat"[1] to the state; the second alleged that the effect of the Controller's failure to perform his duties was to confer a gift of public funds on the banking organizations; and the third alleged that the deduction of service charges and the cessation of interest payments on dormant accounts by the banking organizations violate this state's public policy. They also sought an order compelling the Controller to conduct an examination and audit of banking organizations with respect to funds subject to escheat, to collect unpaid funds with interest retroactively applied, to enjoin the banking organizations from terminating interest payments and imposing "unreasonable" service charges, to

---

[1]Code of Civil Procedure section 1500 is not a true escheat statute. See discussion under section heading "Taxpayers' Standing to Sue."

issue rules and regulations to prevent unlawful and abusive practices by the banking organizations, and to seek the imposition of fines and penalties. They also requested reasonable attorney fees.

During the pendency of the lawsuit the Controller adopted regulations under his emergency rule-making power. (Code Civ. Proc., § 1580; Gov. Code, §§ 11421, 11422, subd. (c).) In general, the regulations permitted the banking practices complained of by plaintiffs. Plaintiffs challenged the regulations, seeking a preliminary injunction and declaratory relief. The court found that (1) there was no factual basis to support an emergency; and (2) the administrative regulations must be promulgated with safeguards required by law. On that basis it granted a preliminary injunction preventing the implementation of the regulations.

The second complaint (Farley) bases its causes of action on bank practices pertaining to uncashed traveler's checks. Service charges are said to have been improperly deducted in violation of the Unclaimed Property Act.

The trial court granted the Controller a motion for judgment on the pleadings as to both complaints. In Slettland, plaintiffs' motion for summary judgment was denied. Further, their motion for attorney fees respecting only the preliminary injunction was denied without prejudice.

On appeal, the posture of the case is as follows: Appellants in both cases challenge the trial court's judgment on the pleadings. The Slettland plaintiffs challenge the denial of their motion for summary judgment[2] and the denial of attorney fees. Further, this court is asked to assess additional attorney fees for the summary judgment issues.[3]

---

[2] There is no record that plaintiff Farley's motion for summary judgment which was set for hearing was in fact heard. However, in view of our reversal and remand, we do not reach the question of the motion for summary judgment for any of the plaintiffs.

[3] We interpret this request to include the judgment on the pleadings which had the effect of a summary judgment against plaintiffs as well as plaintiffs' own motion for summary judgment. However, we decline to rule on the issue of attorney fees. First, with respect to the preliminary injunction, the trial court ruled against plaintiff's request but "without prejudice to renewal of the motion after determination of the appeal now pending." Since we reverse and remand, the motion may be renewed. Second, with respect to the summary judgment issues, appropriate motions may be filed with the trial court.

*Allegations of Complaints*

Plaintiffs have filed this action as taxpayers of this state. Their status as taxpayers is not questioned by defendant Controller. The statutes and cases which control the question of standing can best be understood if we set forth more fully the principal allegations of the two complaints.

Plaintiffs' complaints allege long neglect by the Controller of his duties to protect the public. That neglect is related to certain banking practices which, according to plaintiffs, unlawfully deprive and have deprived the people of this state of many millions of dollars.

Virtually the entire banking industry in California, according to the complaints, has been engaged in practices violative of the law and of public policy. Most banks follow the practice of declaring savings accounts dormant if the depositor has not appeared personally to have the interest posted in the passbook. The requisite time can be as short as two to four years. No notice is sent the depositor even when the address is known to the bank. Once the account is declared dormant, the banks cease interest payments and assess service charges against the account ranging from $12 to $36 annually.

To the people of this state, the results of those practices are serious.[4] Most accounts, once declared dormant, are not claimed by the depositor. When not claimed, the property escheats to the state. The complaints estimate that approximately $100 million have been lost to the state by the cessation of interest payments and imposition of a variety of service charges, all in violation of law.

Several other banking practices are challenged in addition to those related to savings accounts. Matured time deposits, certified checks, unclaimed money orders, drafts, and other similar instruments have been treated by the banks much like the savings accounts. "Excessive" charges have been deducted in such a manner that little money escheats. The money paid into the bank is consumed by such charges.

---

[4]An exhibit to the complaint illustrates what the practice can mean to a depositor. A grandfather opened savings accounts for each of his four grandchildren. Years later, when the need arose, he withdrew the balance in one account for the benefit of one grandchild. Some time thereafter, the other accounts were closed. To his surprise the accounts which had been on deposit longer had a lower balance than the first account.

The complaint is against the Controller for his action—more precisely, his inaction. Plaintiffs charge that the Controller has a statutory duty to protect the state interest; by not protecting that interest he has permitted the practices to continue; specifically, the Controller has the duty to collect all abandoned property including savings accounts and other accounts included in the complaint, less reasonable service charges. Further, plaintiffs continue, the statutes specifically proscribe the termination of interest payments and thus the Controller is mandated to collect those moneys.

To assist the Controller in performing his duties, plaintiffs point to the statutory scheme which provides that banking organizations are to file schedules with the Controller specifying charges to be made, all of which must be reasonable. The Controller is empowered to examine and audit bank records, to commence legal proceedings, to impose fines, to seek civil penalties, and most importantly, to issue regulations. Plaintiffs charge that the defendant Controller has failed to exercise his discretionary duties to prevent the banking practices which inured to the detriment of the people of this state.

*Taxpayers' Standing to Sue*

The banking practices and the related inaction of the Controller concern, as we previously indicated, the Unclaimed Property Law of California (Code Civ. Proc., § 1513, subd. (a)). Essentially, that section declares that all unclaimed savings and similar deposits escheat to the state together with interest and dividends. However, we do not deal with a true escheat statute, for the purpose of the act is two-fold. First, it indeed does protect the state by declaring its ownership of unclaimed property. Second, it protects the individual depositor who can lay claim to the property at any time until there has been a permanent escheat. (Code Civ. Proc., § 1430.) The state derives its right to the property from the initial owners, the depositors. (*Bank of America* v. *Cranston* (1967) 252 Cal.App.2d 208 [60 Cal.Rptr. 336].)

The Controller may be held accountable by the courts pursuant to a taxpayer's suit only if plaintiffs have standing. ■ The issue of standing is determined by the courts as a matter of policy. In large measure it depends on the fitness of the person to raise the issues. (*Harman* v. *City and County of San Francisco* (1972) 7 Cal.3d 150, 159 [101 Cal.Rptr. 880,

496 P.2d 1248].) ▆ In California, as in most jurisdictions,[5] a state taxpayer has standing to maintain an injunction suit against a state official to prevent illegal expenditures of state money. (See *California State Employees' Assn.* v. *Williams* (1970) 7 Cal.App.3d 390, 392-395 [86 Cal.Rptr. 305]; *Ahlgren* v. *Carr* (1962) 209 Cal.App.2d 248 [25 Cal.Rptr. 887]; *Blair* v. *Pitchess* (1971) 5 Cal.3d 258 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206]; *Stanson* v. *Mott* (1976) 17 Cal.3d 206 [130 Cal.Rptr. 697, 551 P.2d 1].)

Further, a California taxpayer has a justiciable interest in money belonging to the state. (*Ibid.*) That holds true whether the money is in the treasury and about to be illegally spent or whether the money is in the hands of a third person but belongs to the state. And Government Code section 12418 commands the Controller to collect moneys due the state.

Underlying California's affirmative response to the question of taxpayers' standing is the confidence expressed in decisional law that governmental performance, commanded by statute, is measureable and thus amenable to judicial redress. (*Lundberg* v. *County of Alameda* (1956) 46 Cal.2d 644 [298 P.2d 1]; *Harman* v. *City and County of San Francisco, supra,* 7 Cal.3d 150.)

The essence of the taxpayer suit in California is accurately expressed: "[T]he judicial process is the only means by which the individual citizen is guaranteed an influence on official conduct. In the end, the foundation of democratic government rests in the individual. If he is unable to do no more than ratify in the voting booth political decisions that have already been made or support with his vote some general policy trend that he favors, he is left without the ability to influence the day-to-day affairs of state. These daily decisions determine how far and in what direction our society will advance. Consequently, the individual citizen must be able to take the initiative through taxpayers' suits to keep government accountable on the state as well as on the local level." (28 Hastings L.J. at p. 508.)

The cases we have analyzed refine the teaching of *Elliott* v. *Superior Court* (1960) 180 Cal.App.2d 894 [5 Cal.Rptr. 116], and *Silver* v. *Watson*

---

[5]Approximately three-fourths of the states permit taxpayers' actions against public officials. (Collins & Myers, *The Public Interest Litigant in California: Observations on Taxpayers' Actions,* 10 Loyola L.A. L.Rev. 329, 331.)

California courts have analogized taxpayers' suits against state officials to those permitted against local officials pursuant to Code of Civil Procedure section 526a. (See generally, 28 Hastings L.J. 477, *California Taxpayers' Suits: Suing State Officers Under Section 526a of the Code of Civil Procedure.*)

(1972) 26 Cal.App.3d 905 [103 Cal.Rptr. 576], which appear to disagree with our conclusion regarding standing. There is no disagreement that purely discretionary acts by public officials may not be the subject of a taxpayer's suit. However, the *Elliott* and *Silver* courts sustained general demurrers to taxpayer suits brought after defendant public officials had failed to act against other wrongdoing officials who failed to protect the public purse. *Elliott* holds, in part, that the taxpayer may not sue without specific statutory authorization. And the *Silver* court holds, in part, that a taxpayer may not sue a public official who exercises his discretion not to act. However, in *Stanson v. Mott, supra,* 17 Cal.3d 206, the Supreme Court reversed the trial court, which had sustained a demurrer of a state public official (Director of the State Department of Parks and Recreation) to a taxpayer's suit alleging an improper good faith expenditure of public funds. The suit was not based on statutory authorization. And the defense of good faith exercise of his discretion was not persuasive. Thus, the Supreme Court has implicitly approved a concept of standing which embraces the position of plaintiffs in the instant cases.

That taxpayers have standing appears settled. We so hold.

*Appropriate Remedies*

We have established that plaintiffs have standing. Now we turn to the more perplexing problem of remedies. Plaintiffs seek injunctive and declaratory relief. Again, *Stanson v. Mott* is our guide.

Plaintiff Stanson sought to require the defendant state employee personally to repay funds to the state treasury. The Supreme Court rejected the rule of strict liability but remanded on the theory that plaintiff could be entitled "at least, to a declaratory judgment" and to "injunctive relief if he could establish that similar expenses were threatened in the future." (*Stanson v. Mott, supra,* at p. 206.) At first impression, it appears that plaintiffs are fully entitled to the relief sought. But, as we explain below, we cannot so conclude on this record.

There are two important differences between *Stanson* and the case at bar. First, unlike *Stanson,* plaintiffs seek a mandatory injunction. They seek a court order compelling the Controller to exercise his duty. Second, they seek declaratory relief against the Controller. But, the rights also affect the interests of third parties not represented, the banks. In their absence it is not clear whether equity can, in this case, as it normally should, resolve all pertinent issues and avoid multiplicity of litigation.

Further, lacking an evidentiary record, we cannot tell whether the Controller has discharged or is in the process of discharging the duty which plaintiffs seek here to enforce. That is, are plaintiffs mere interlopers not entitled to relief? (Cf. *Keith* v. *Hammel* (1915) 29 Cal.App. 131, 133 [154 P. 871]; 28 Hastings L.J. 477, 506.) The record has not been developed to a point which permits the court to fix the appropriate relief. It is the trial court, before whom the facts will be developed, which must rule in the first instance.

The judgment is reversed with directions to the trial court to conduct further proceedings consistent with the views we express.

Puglia, P. J., and Friedman, J.,* concurred.

A petition for a rehearing was denied March 28, 1978, and respondent's petition for a hearing by the Supreme Court was denied May 11, 1978.

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.