[Civ. No. 20871. Third Dist. Jan. 25, 1985.]

BANK OF AMERICA, Plaintiff, Cross-defendant and Appellant, v.
KENNETH CORY, as State Controller,
Defendant, Cross-complainant and Appellant.

MARGARET SLETTLAND et al., Plaintiffs and Respondents, v.
KENNETH CORY, as State Controller, Defendant and Appellant.

68

**COUNSEL**

John M. Anderson, Paul M. Zieff, Richard B. Caine, Frederick M. Pownall, Howard D. Neal and Landels, Ripley & Diamond for Plaintiff, Cross-defendant and Appellant.

William Alsup, Paul R. Dieseth and Morrison & Foerster as Amici Curiae on behalf of Plaintiff, Cross-defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Yeoryios C. Apallas, Jeffrey J. Fuller and Gail A. Strader, Deputy

Attorneys General, for Defendant, Cross-complainant and Appellant and Defendant and Appellant.

Gary J. Near, Stephen Kaus and Kaus & Kerr for Plaintiffs and Respondents.

Harvey M. Freed as Amicus Curiae on behalf of Plaintiffs and Respondents.

## OPINION

EVANS, J.—Following protracted and convoluted litigation, this appeal places at issue the question of the applicability of a statute of limitations to the California Unclaimed Property Law (Code Civ. Proc., § 1500 et seq., hereafter UPL) and the enforcement of the UPL or lack thereof by the State Controller, and the propriety and amount of interest and/or penalty assessed upon an order of escheat. Bank of America (Bank), as appellant and cross-respondent in No. 257509, addresses the questions of the applicability of a statute of limitations to the UPL, its retroactivity, and the propriety of the order imposing damages and interest pursuant to Government Code section 12419 in an action seeking to recover property pursuant to the UPL. Controller of the State of California (hereafter Controller), respondent and cross-appellant in No. 257509 and appellant in No. 250500, also contests portions of the interest award, the findings the Controller was not effectively enforcing the UPL prior to the present administration, and that respondent taxpayers contributed significantly to the litigation and are thus entitled to an award of attorney fees.

The legal and factual complexity of the various contentions presented makes necessary the following extensive procedural and factual exposition.

On September 5, 1974, taxpayers filed action No. 250500 seeking to compel then Controller Houston Flournoy to enforce the UPL. The complaint alleged through dereliction of duty the Controller had allowed banking institutions to impose service charges on "dormant accounts"[1] and to discontinue payment of interest on such accounts. As a result, some dormant accounts which should have been delivered to the state under the UPL had been retained by those banking institutions and consumed by means of charges levied on them.

---

[1]Dormant accounts are those accounts upon which no action has been taken for seven years. (Code Civ. Proc., § 1513, subd. (a).)

The Controller filed an answer to the complaint, and shortly thereafter enacted "emergency" regulations pertaining to the UPL. Taxpayers then sought and were granted an injunction stopping the implementation of those regulations; the injunction was based on the lack of evidence or factual basis to justify the asserted emergency character of the rules.

On January 29, 1975, the Controller filed a motion for judgment on the pleadings; the motion was granted, and the taxpayers' contemporaneous motion for summary judgment was denied. The order of the trial court granting judgment on the pleadings was ultimately reversed by this court in *Farley* v. *Cory* (1978) 78 Cal.App.3d 583 [144 Cal.Rptr. 923], which held taxpayers had standing to pursue their action which sought to compel the Controller to perform his duties.

During September 1975, and pending resolution of the appeal in *Farley* v. *Cory, supra,* 78 Cal.App.3d 583, Bank submitted an accounting to the Controller which showed Bank had withheld interest and imposed service charges on dormant accounts from 1959 until 1974 in the amount of $9,486,149. On October 1, 1975, the Controller, pursuant to Government Code section 12419, attempted to state an account for that amount plus interest and damages. Rather than pay the demand, Bank filed a complaint for declaratory relief, seeking to clarify its right to levy charges and discontinue interest payments on dormant savings accounts, and the Controller's right to bring an action after 15 years of apparent acquiescence. (No. 257509.) Controller cross-complained, seeking payment of all improperly withheld charges and interest payments. Shortly thereafter, the Controller moved for partial judgment on the pleadings on certain issues which did not require findings of fact.

On June 20, 1976, Superior Court Judge Irving Perluss granted the Controller's motion and found (1) the Controller's rights under the UPL are derivative and that he succeeded to whatever rights the owners of the abandoned property may have; (2) banking institutions may not impose service charges nor discontinue the payment of interest on dormant accounts in the absence of a statute or a valid contract between the institution and the depositor; (3) banking institutions may not seek to implement the terms of such a contract against the Controller if it could not enforce them against the depositor; and (4) because of the derivative rights of the Controller, he was not barred by any statute of limitations from seeking to recover such funds.

Following the issuance of the opinion in *Farley* v. *Cory, supra,* 78 Cal.App.3d 583, in 1978, taxpayers served Bank as a Doe defendant and moved for consolidation of cases No. 250500 and No. 257509. The trial

court denied the motion; taxpayers then petitioned this court for a writ of mandate directing the superior court to consolidate the cases, and were ultimately successful.

On the issues as framed by the Perluss order, the consolidated actions finally went to trial in December 1979. Following a six-week trial, Judge Richard Backus issued the following findings of fact and conclusions of law germane to this appeal: (1) Bank was not entitled to impose service charges, or discontinue payment of interest on dormant accounts in the absence of an authorizing statute or a valid contract between it and the depositors; (2) the Controller was not estopped from enforcing the UPL against Bank and was not barred by the statute of limitations; (3) the Controller had properly stated an account with Bank pursuant to Government Code section 12419, and was entitled to recover the amount stated plus interest in the amount of 10 percent per annum and 25 percent damages; however, the court, in that aspect of the proceeding, held Code of Civil Procedure section 338, subdivision 1, which fixes a three-year limitation to be applicable; (4) the Controller did not start to effectively enforce the UPL until challenged by the taxpayers' suit; (5) the Controller was ordered to take all steps reasonably necessary to identify owners of unclaimed accounts paid to him; and (6) that taxpayers are entitled to attorney fees under Code of Civil Procedure section 1021.5 *and* the common fund doctrine. In its statement of intended decision, the trial court also adopted the Perluss decision.

The UPL was enacted in 1959 (Stats. 1959, ch. 1809), and provides for the escheat of certain abandoned property, including "any demand, savings, or matured time deposit, or account subject to a negotiable order of withdrawal, . . ." (Code Civ. Proc., § 1513, subd. (a).) That section permits banking institutions and others holding such funds to deduct "reasonable service charges which may lawfully be withheld and *which do not* (where made in this state) *exceed those set forth in schedules filed by the banking organization from time to time with the State Controller.*" (Italics added.)

Prior to 1974, only 31 such schedules had been filed with the State Controller, although there were more than 160 banks operating in California at the time. The Controller's office was aware Bank was not paying interest on dormant accounts and had "cannibalized" smaller accounts by imposing service charges. Bank justified this activity by asserting the signature cards signed by depositors were valid contracts for the imposition of service charges and the discontinuance of interest payments. Prior to 1974, that Bank practice had not been challenged by the Controller's office. From 1959 until 1974, only two audits focusing on the question of service charges imposed on dormant accounts had been performed.

BANK'S APPEAL

## APPLICABILITY OF A STATUTE OF LIMITATIONS

■ Bank appeals from that portion of the judgment finding the Controller was not barred by the three-year period of limitation established by Code of Civil Procedure section 338, subdivision 1.[2] It contends an action to enforce the provisions of the UPL is "[a]n action 'upon a liability created by statute'" (§ 338, subd. 1), and as a consequence any attempt to enforce the UPL is time limited by that section. Bank argues the trial court erred in applying the derivative rights theory which allows the Controller to stand in the shoes of the depositor and claim the protection of section 348,[3] which states there is no limitation on the time in which an action to recover money from a holder must be commenced by a depositor. We fail to find merit in Bank's contentions.

■ The California UPL is not a true escheat statute; rather, it has dual objectives: (1) to reunite owners with unclaimed funds or property, and (2) to give the state, rather than the holder, the benefit of the use of unclaimed funds or property. (*Douglas Aircraft Co.* v. *Cranston* (1962) 58 Cal.2d 462, 463 [24 Cal.Rptr. 851, 374 P.2d 819, 98 A.L.R.2d 298]; *Farley* v. *Cory, supra,* 78 Cal.App.3d at p. 588.) The state, through the Controller, acts as the protector of the rights of the true owner. (*Cory* v. *Public Utilities Com.* (1983) 33 Cal.3d 522, 528 [189 Cal.Rptr. 386, 658 P.2d 749].) When considered in total context, the statutory scheme of the UPL compels the Controller to affirmatively take all steps necessary to carry out the purposes of the UPL. (See § 1531.)

With those objectives in mind, we find the derivative rights theory postulated in *Bank of America* v. *Cranston* (1967) 252 Cal.App.2d 208 [60 Cal.Rptr. 336], helpful in determining if a statute of limitations is applicable to an action to enforce compliance with the UPL. At the outset of that opinion, the court stated "The Controller's rights under the act are derivative. He succeeds, subject to the act's provisions, to whatever rights the

---

[2] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

[3] Section 348 provides: "To actions brought to recover money or other property deposited with any bank, banker, trust company, building and loan association, or savings and loan society or evidenced by a certificate issued by an industrial loan company or credit union there is no limitation. [¶] This section shall not apply to banks, bankers, trust companies, building and loan associations, industrial loan companies, credit unions, and savings and loan societies which have become insolvent and are in process of liquidation and in such cases the statute of limitations shall be deemed to have commenced to run from the beginning of the process of liquidation; provided, however, nothing herein contained shall be construed so as to relieve any stockholder of any banking corporation or trust company from stockholders' liability as shall at any time, be provided by law."

owners of the abandoned property may have." (*Id.*, at p. 211.) The opinion went on to discuss a contractual right between the purchasers of traveler's checks and the bank, holding that right accrues to the Controller in its entirety. (*Id.*, at p. 214.) Bank argues the holding of *Cranston* is applicable only to the substantive rights of the owner, not procedural rights.

To conclude as Bank urges that the state does not succeed to the procedural rights and protections as well as the substantive rights afforded an owner would thwart the obvious intent of the Legislature. Section 348 states "*there is no limitation*" (italics added) upon the time in which an action must be brought to recover money deposited with "any bank, banker, trust company, building and loan association, or savings and loan society." In enacting section 348, the Legislature clearly indicated it believes a depositor is entitled to the full protection of the law, unhindered by a statute of limitation. (*Wells, Fargo, & Co.* v. *Enright* (1900) 127 Cal. 669, 674 [60 P. 439]; *Maguire* v. *Hibernia S. & L. Soc.* (1944) 23 Cal.2d 719, 733 [146 P.2d 673, 151 A.L.R. 1062].) In his role as protector of the rights of depositor owners of dormant accounts, the Controller is equally entitled to such protection. To hold otherwise would be absurd; the depositor would not be restricted by any time limitation in which to seek recovery of his money; however, if the account became dormant, subject to the UPL, and the Controller did not act within three years, the account would then be beyond the reach of the Controller and the depositor. The potential for such mischief compels conformance with decisional authority which directs that statutes not be construed in a manner leading to an absurdity, if they may be construed to achieve justice and common sense. (*Outboard Marine Corp.* v. *Superior Court* (1975) 52 Cal.App.3d 30, 36 [124 Cal.Rptr. 852].)

Moreover, application of section 338, subdivision 1, to this action would directly conflict with and negate the impact of section 1570, a part of the UPL. That section holds "The expiration of any period of time specified by statute or court order, during which an action or proceeding may be commenced or enforced to obtain payment of a claim for money or recovery of property from the holder, does not prevent the money or property from being escheated, nor affect any duty to file a report required by this chapter or to pay or deliver escheated property to the State Controller." The provisions of section 338, subdivision 1, if applied to an action brought by the Controller to recover money deposited in banking institutions, would be in direct conflict with section 1570. In such circumstances, it is incumbent on a reviewing court to reconcile statutes and avoid interpretations which would require us to ignore one statute or the other. (*Fuentes* v. *Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 1, 7 [128 Cal.Rptr. 673, 547 P.2d 449].) By giving effect to section 1570, we do not hold

that the Legislature repealed by implication section 338, subdivision 1; we merely acknowledge a legislatively created exception to the applicability of section 338, subdivision 1.

Bank cites *Blue Cross of Northern California* v. *Cory* (1981) 120 Cal.App.3d 723 [174 Cal.Rptr. 901], in support of its contention that section 1570 does not abrogate the defense of the statute of limitations to an action brought by the Controller pursuant to the UPL. The reliance is misplaced.

First, the unclaimed property in *Blue Cross* consisted of unnegotiated and unreturned checks mailed to insurance subscribers entitled to payments on their policy. Section 348 was not discussed or implicated, as no money or other property was being held in a deposit with a banking institution. Moreover, the derivative rights concept was not considered or discussed.

*Blue Cross,* apparently in reliance upon *Douglas Aircraft, supra,* 58 Cal.2d 462, held that section 1570 did not constitute an exception to the defense of a statute of limitations in favor of the Controller, and found section 338, subdivision 1, to be applicable and enforced it against the Controller. That conclusion managed to create chaos out of an otherwise orderly and harmonious statutory scheme; we will not follow that path.

Finally, *Blue Cross,* in relying upon *Douglas Aircraft,* failed to analyze the basis for that decision. *Douglas Aircraft* held the Controller could not bring an action under the UPL to force escheat of unpaid and unclaimed wages held by an employer which could not be recovered by the employee by reason of the bar of a statute of limitations prior to the enactment of the UPL. The obvious rationale of *Douglas Aircraft* was that a holder could rely upon a statute of limitations, which was applicable prior to adoption of the UPL, and conduct its affairs accordingly. (58 Cal.2d at pp. 465-466.) In that case, a contrary decision allowing the Controller to revive a claim clearly barred by time against the owner would have resulted in a gross miscarriage of justice. In the case of banking institutions as described in section 348, no such prejudice could arise, as they are always potentially responsible in any action brought by a depositor to recover money or property.

Finally, section 1570 clearly states a holder has a continuing duty to report and deliver to the state all property subject to the UPL. A corollary to that statute is that there is no limitation on the time in which an action may be brought by the Controller to enforce the provisions of the UPL. Thus, even apart from the derivative rights theory, any action brought by

the Controller against a bank to recover funds subject to the UPL may not be time barred.

RETROACTIVITY AND FORMER SECTION 1510, SUBDIVISION (g)

Bank contends the trial court's judgment allowing the Controller to recover service charges levied, and unpaid interest on dormant accounts, gives the UPL "eternal retroactivity." When the UPL was enacted, it contained former section 1510, subdivision (g) (deleted by Stats. 1968, ch. 356, § 24, p. 746), which prescribed the contents for the initial report required to be filed by the banks: "The initial report filed under this chapter shall include all items of property held for another person which are ascertainable from the available records of the holder, which items of property would have been presumed abandoned if this chapter had been in effect at and after the time such property first became payable, demandable, or returnable; provided, that only such moneys which first became unclaimed funds, as that term is defined in this chapter, within three years preceding the effective date of this chapter must be included within the initial report and any other moneys constituting unclaimed funds as thus defined may be included within the initial or any subsequent report and if so included the holder shall be entitled to the protection afforded by Section 1513. All items of property, less proper charges and offsets, other than unclaimed funds, which on January 1, 1949 appeared from the available records to be held for another person and were thereafter without notice to the owner or without prior approval of any regulatory or licensing authority of this State transferred or credited by the holder directly to capital or surplus or undivided profits shall be deemed to be subject to the provisions of this chapter and shall be included within the initial report." (Stats. 1959, ch. 1809, § 2, p. 4302.)

Bank and the Controller present conflicting arguments regarding the interpretation and reach-back effect of that section. However, we need not resolve that conflict. The subject judgment requires the Bank to render an accounting to the Controller of property which was subject to the escheat provisions of the UPL for years 1959 through the present, subject to the availability of records which were not in the ordinary course of business destroyed by Bank, and from which any such property could be identified. An officer of Bank testified that until 1974, Bank retained signature cards for 25 years. After 1974, the retention schedule was decreased to seven years. No other evidence was presented as to the availability of Bank's records.

If, as a result of the accounting, it is found records do exist from the date the original report was due, an interpretation of former

section 1510, subdivision (g), will be ripe for consideration and then should first be considered with the accounting in the trial court.[4]

GOVERNMENT CODE SECTION 12419/INTEREST AWARDS

On October 1, 1975, pursuant to Government Code section 12419,[5] the Controller attempted to state an account with Bank in the amount of $9,486,149, which was the sum submitted by Bank as the amount of withheld interest and wrongfully imposed service charges which consumed or diminished dormant accounts. Bank refused to pay the amount demanded within the 20-day period prescribed by the statute; instead, it filed a complaint for declaratory relief seeking a determination of the legal rights and obligations of the parties. Controller cross-complained and included the stated account as one cause of action.

Following trial, the trial court found the Controller was entitled to (1) 25 percent damages pursuant to Government Code section 12419, subject to the three-year statute of limitations set forth in section 338, subdivision 1; (2) 10 percent interest pursuant to Government Code section 12419, again subject to the period of limitation set forth in section 338, subdivision 1; (3) prejudgment interest at the rate of 7 percent per annum on property reportable and payable from 1959 through and including 1971 and 1976; (4) interest at the rate of 10 percent, pursuant to Government Code section 12419, for property reportable from 1972 through 1975; and (5) interest at the rate of 12 percent per annum, pursuant to section 1577 for property reportable and/or payable in 1977 and the years following.

The essence of Bank's contentions is that (1) Government Code section 12419 constitutes a penalty not authorized by the UPL; (2) the Controller should have been limited to an action pursuant to the UPL, section 1576, which provides the exclusive penalty when enforcing the UPL; (3) if the imposition of interest and damages pursuant to Government Code section 12419 is justified, the Controller is subject to the one-year limit of section

---

[4]Amicus, Crocker National Bank, raises an argument based upon Financial Code section 861. Such a question was not raised or considered at trial, and "[i]t is settled that a party may not raise a new theory for the first time on appeal [citation] because to permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant. [Citation.]" (*Sierra Club, Inc.* v. *California Coastal Com.* (1979) 95 Cal.App.3d 495, 503 [157 Cal.Rptr. 190].) In the posture presented, we will not consider the contention.

[5]The applicable portion of Government Code section 12419 reads: "The Controller shall state an account with any person who: . . . [¶] (b) Fails to pay into the State treasury any money *belonging* to the State upon being required so to do by the Controller, within 20 days after such requisition. [¶] In stating such an account, the Controller shall charge 25 per cent damages, and interest at the rate of 10 per cent annually from the time of the failure." (Italics ours.)

340; and (4) the trial court incorrectly applied the interest provisions of Government Code section 12419. In his cross-appeal, the Controller contends (1) the trial court erred in limiting the interest and damages provisions of Government Code section 12419 to the three-year limitation of section 338, subdivision 1.

■ An examination of the UPL reveals it to be complete within itself, providing causes of action for failure to comply (§ 1572) as well as for penalty and interest in certain instances (§§ 1576 and 1577). Yet, the Controller chose to step outside the UPL and proceed under an unrelated section of the Government Code.

Government Code section 12419 is derived from former Political Code section 437. Those statutes are similar in effect and content. The reported cases indicate the last use of Political Code section 437 was made in 1897 (*People* v. *Wilson* (1897) 117 Cal. 242 [49 P. 135]), and we have found no reported use of Government Code section 12419.

The few cases which discuss former Political Code section 437 involved state officials who were under a duty to pay into the state treasury funds which belonged to the state. (See *People* v. *Van Ness* (1888) 76 Cal. 121 [18 P. 139]; *People* v. *Melone* (1887) 73 Cal. 574 [15 P. 294]; *People* v. *Wilson, supra,* 117 Cal. 242; *People* v. *Bunker* (1886) 70 Cal. 212 [11 P. 703]; *People* v. *Lattimore* (1861) 19 Cal. 365.)

An obvious distinction exists between those cases and the present proceeding. In each of the cases pursued under former Political Code section 437, the property sought by the state *belonged* to the state. In the present instance, at the time the action (Gov. Code, § 12419) was undertaken, the property sought did not belong to the state. The state merely had a right to possession of the property; that right was derived solely through the Unclaimed Property Law. (§ 1300 et seq.) Since the UPL is not a true escheat statute in the historical sense, the property does not belong to the state in ownership until a permanent escheat has been accomplished, pursuant to sections 1430 and 1431. In this instance, not only had permanent escheat not been accomplished, the procedures to achieve such status had not been undertaken. (*Farley* v. *Cory, supra,* 78 Cal.App.3d at p. 588; *Bank of America* v. *Cranston, supra,* 252 Cal.App.2d at pp. 211-212.) As a consequence, the state was not entitled to proceed pursuant to Government Code section 12419 to collect "money which belongs to the state." The Controller's only remedy for recovery of the funds is provided by the UPL.

We note that in superficially considering this aspect of the appeal, the Controller's choice of action appears puzzling. However, upon close in-

spection, the reason for the strategy becomes apparent. The penalty provisions of the UPL are contained in section 1576, and authorize imposition of a fine and/or imprisonment for *willful* failure to pay or deliver unclaimed property to the state. The trial court expressly found the Controller was aware the Bank's failure to report, as required by the UPL, was predicated upon an erroneous belief that bank signature cards constituted a valid contract and took no steps to force compliance. As a consequence, if damages or a penalty were to be extracted from the Bank, some procedure not requiring proof of a willful act would be required, hence, the selection of Government Code section 12419 with its provisions allowing imposition of interest and damages without proof of willful intent.

Government Code section 12419 by its terms is not applicable to actions to recover unclaimed property under the UPL. Moreover, under the totality of circumstances indicating years of apparent acquiescence, it would be unconscionable to allow the Controller to collect the interest and damages (penalty) authorized by Government Code section 12419 as well as the interest prescribed by the UPL.

The court award of interest at the rate of 10 percent, and 25 percent damages pursuant to Government Code section 12419 must be reversed.

■ The Controller argues the trial court erred in limiting the provisions of section 1577 to property reportable in the years 1977 and following. He contends the 12 percent rate is applicable to all sums which were subject to the UPL on January 1, 1977, and years following. He is correct.

Section 1577, which provides for interest at 12 percent per annum, was added in 1976, effective January 1, 1977 (Stats. 1976, ch. 49, § 3, p. 81); however, Bank's obligation to report and pay sums subject to escheat existed prior to the effective date of section 1577. In *Gregory* v. *State of California* (1948) 32 Cal.2d 700 [197 P.2d 728, 4 A.L.R.2d 924], plaintiff sought to recover interest on a refund of a tax paid under protest. After the tax had been paid, a statute was enacted providing for interest on overpayment of taxes. The trial court awarded plaintiff interest on the one payment from and after the effective date of the statute. (*Id.,* at p. 701.) The state argued such an award was improper as it gave the statute a retroactive effect. The reviewing court rejected the argument, stating, "[i]t has been held that where a statute provides that an obligation bear interest, and such obligation existed prior to the effective date of the statute, and would not bear interest except for a statute, a holding that interest be computed from the effective date of the statute, is not giving retroactive effect to such statute. (*Dunne* v. *Mastick,* 50 Cal. 244.)" (*Id.,* at p. 702.) It is the continued

withholding of the sum due after the effective date of the statute which creates a debt upon which the interest may be charged.

That portion of the judgment limiting the application of section 1577 to those funds that became subject to the UPL after January 1, 1977, must be modified to award the Controller interest at the rate of 12 percent on all sums which were owing as of January 1, 1977, and thereafter.

■ In light of our conclusion that the interest provisions of Government Code section 12419 are not applicable, that portion of the judgment awarding the Controller prejudgment interest at the rate of 7 percent on funds reportable and payable only in the years 1959 through 1971 and 1976 must be modified. The purpose of prejudgment interest (Civ. Code, §§ 3287-3288) is to compensate a party for the loss of use of his or her property. (*Bullis* v. *Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 815 [148 Cal.Rptr. 22, 582 P.2d 109, 7 A.L.R.4th 642].) In its statement of intended decision, the trial court found "an award of prejudgment interest from the dates upon which moneys were payable would compensate Cory (and any owners who may claim escheated funds from him) for the loss of use of the money." The Controller and owners of the funds escheatable during the years 1959 through 1976 can only be adequately compensated for their loss of use by the award of prejudgment interest for each of those years rather than for the years as limited by the trial court.

### No. 250500—CONTROLLER'S APPEAL

#### ATTORNEY FEES

The Controller appeals from the trial court's findings that he had not effectively enforced the UPL prior to the taxpayers' suit, and that the taxpayers were entitled to attorney fees for their participation in the consolidated actions. His principal challenge to the award of attorney fees is directed to the sufficiency of the evidence to sustain that award. He also contends his motion for a new trial was erroneously denied, and attacks the validity of the order requiring him to ascertain the names and addresses of the owners of all dormant accounts and items paid to him since September 5, 1974.

Less than one month after the taxpayers filed suit, the Controller attempted to enact emergency UPL regulations. Those regulations provided: (1) a one-time service charge of $12.50 on accounts of $500 or less would be presumed reasonable; (2) dormant account charges on a demand (checking) account would be presumed reasonable provided they did not exceed the service charge imposed on active accounts; (3) charges could not be im-

posed unless permitted by the UPL and were made pursuant to contract or statute; (4) charges could not be waived in favor of the depositor but enforced against the Controller; and (5) interest could not be discontinued unless pursuant to contract or statute.

 Taxpayers then sought to enjoin implementation of the regulations asserting they conflicted with section 1513 and that there was no factual basis for the adoption of the regulations on an emergency basis. True to the prediction of the drafter of the regulations, the Controller was "somewhat vulnerable" on the latter ground. The court found "there was no factual basis to adopt the emergency regulation," and a preliminary injunction issued.

The Controller now argues the actions of the taxpayers in obtaining the preliminary injunction accomplished nothing, and cannot provide the basis for an award of attorney fees. He specifically asserts the presumption of reasonableness of the $12.50 charge could not have been triggered until a bank met the preliminary requirements of proving that the service charge was made pursuant to statute or contract, and was not waived in favor of a depositor but enforced against the Controller.

The argument is at best superficial hyperbole. The actual practices followed by the Controller's office would not have compelled a bank to meet the so-called preliminary requirements. The drafter of the challenged regulations testified the Controller would not have audited banks which imposed the presumably reasonable service charge of $12.50. The Chief of the Unclaimed Property Division also testified it was not the practice of the Controller to request a copy of the contract relied upon by the holder to impose service charges unless an audit was to be conducted, and that audits were conducted only if the service charges appeared to be unreasonable. Since the $12.50 charge was to be presumed reasonable, a bank could impose such a charge without fear of being required to produce a contract since it would not be audited.

The Controller also most strenuously asserts the taxpayers were mere interlopers in the combined actions who began interfering with the Controller's business by filing a useless complaint and then persisted by parasitically taking part in the action against the Bank.

The trial court found the contrary to be true and made the following findings:

1) "The Controller did not start to effectively enforce the UPL with respect to the Bank's dormant account practices until here challenged by the suit of these taxpayers."

2) "The taxpayers here filed the first lawsuit which has substantially and seriously challenged the long-standing practices of California banks, including the Bank of America, with respect to charges levied against dormant accounts under the UPL in September, 1974."

3) "After taxpayers filed their action, they obtained a preliminary injunction—despite the Controller's vigorous opposition—which invalidated the Emergency Administrative Regulations, the effect of which included the following:

"A. Service charges of $12.50 or less as to each dormant savings account would have been presumed reasonable. The average size of a dormant savings account at the Bank of America was approximately $12.57.

"B. Service charges as to each dormant checking account in an amount identical to service charges charged against each active checking account would have been presumed reasonable."

4) "The invalidation by the taxpayers' actions of the portion of the emergency regulations which set forth an amount of dormant service charges as being presumptively reasonable preserved to the account holders the right to claim such charges to the extent that the Court would have found such amounts unreasonable."

5) "The Court has previously found that the entire amount of the Bank's dormant service charges on demand deposit accounts was not lawfully imposed. The taxpayers argued *this* position. The Controller argued at trial that the Bank had to report and pay to the Controller only the incremental difference between the dormant service charges and the Bank's active service charges. The amount of recovery secured for the account holders and the general public by the difference in these two positions is presently unknown. The Bank's accounting will determine the amount of the difference." (Italics in original.)

6) "The necessity and financial burden of the portion of the consolidated actions attributable to private enforcement by the taxpayers' suit are such as to make an award of attorneys' fees appropriate."

The court concluded by stating that the requirements of section 1021.5[6] had been satisfied, as had been the requirements of the common fund doctrine.

---

[6]"Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons; (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. . . ."

In addition to the successful invalidation of the Controller's attempt to adopt emergency regulations, the following brief summary of evidence more than supports the court's general findings relative to attorney fee entitlement.

Taxpayers' complaint named as Doe defendants banking organizations in California which had allegedly failed to report escheatable property to the state as required by the UPL, and sought as well to compel the Controller to perform his duty and enforce the UPL. Following institution of the taxpayers' suit, the Controller filed his action against Bank; the taxpayers then vigorously urged, in the face of adamant opposition by the Controller, to have the cases consolidated for trial, and were ultimately successful. The record makes clear that taxpayers' counsel contributed significantly at trial, as issues in both cases often overlapped. At trial, taxpayers argued that because there was no valid contract, no service charge could be imposed; whereas the Controller sought only to recover the incremental difference between active account charges and dormant account charges. The Controller grudgingly concedes the taxpayers' approach resulted in a larger recovery. Most important, however, is the fact the Controller did not enforce the UPL until provoked into action by the taxpayers' suit.

## LACK OF DEMAND

Controller contends the taxpayers failed to make a demand that he enforce the UPL prior to filing their complaint. The contention is patently meritless. A taxpayer's suit against a state official has been analogized to those permitted against local officials under section 526a. (*Farley* v. *Cory, supra,* 78 Cal.App.3d at p. 589, fn. 5.) ■ In an action brought seeking to compel an official to perform his duty, there must be some showing the officer refused to act or for some reason cannot act. (*Miller* v. *McKinnon* (1942) 20 Cal.2d 83, 96 [124 P.2d 34, 140 A.L.R. 570].) ■ In this instance, the taxpayers' complaint contained adequate factual allegations from which it may be concluded the Controller had refused to perform his duty for the previous 15 years. ■ When the allegations of a complaint sufficiently show that a demand would be a useless act and unavailing, it is not required. (*Briare* v. *Matthews* (1927) 202 Cal. 1, 9 [258 P. 939].) ■ Evidence of the Controller's continued failure to enforce the UPL supports the conclusion that a formal demand to enforce would have served no useful purpose.[7]

---

[7]Taxpayers did send a letter to the Controller demanding enforcement. A member of the Controller's staff testified his office was not aware of the letter. A letter from taxpayers addressed to the Federal Reserve System, also demanding enforcement, was received by the Controller.

The Controller contends the evidence shows he was enforcing the UPL at the time taxpayers' suit was filed, thus rendering that action an empty gesture; and that the trial court erred in finding "[t]he Controller did not start to effectively enforce the UPL with respect to the Bank's dormant account practices until here challenged by the suit of these taxpayers." It must be conceded that following the opinion in *Farley* v. *Cory, supra,* 78 Cal.App.3d 583, the Controller has substantially performed his statutory duties under the UPL to secure accounting and payment by banking organizations of charges levied against dormant accounts, and has promulgated valid regulations under the UPL.

In support of his assertion that steps were under way to escheat dormant accounts pursuant to the UPL, the Controller produced letters sent to Bank of America, Santa Monica Bank, and Golden State Bank on August 26, 1974, and September 4, 1974, demanding payment of handling charges withheld on traveler's checks by Bank of America, and payment of service charges imposed and interest withheld on dormant savings and checking accounts from the other two banks. ■ Such evidence constitutes at best a conflict in the evidence, and it is fundamental that on appellate review, all conflicts must be resolved in favor of the judgment and all legitimate and reasonable inferences indulged to uphold the findings of the trial court. (*Leonard* v. *Rose* (1967) 65 Cal.2d 589, 593 [55 Cal.Rptr. 916, 422 P.2d 604].) ■ An overview of the record, taking into account not so much the specific actions the Controller asserts were in process at the time these actions were instituted, but instead the Controller's total action compels us to conclude the actions taken immediately before the taxpayers filed suit were in response to outside pressures, rather than the result of then effective enforcement of the UPL.

One such event involved Robert Kahn, a columnist for several Bay Area newspapers. In early 1973, he wrote an article concerning general bank practices with dormant accounts. Prior to writing the article, Kahn had his son open accounts at seven of the largest Northern California banks and attempt to obtain a copy of each bank's signature cards; he also wrote to the chief executive officer of each of the banks and attempted to ascertain the dormant account practices. He also wrote to the Controller and requested a copy of schedules filed with the state pursuant to section 1513, subdivision (a). In response, the Controller's office called Kahn and informed him it did not have any schedules from United California Bank or Wells Fargo Bank. The second article was published later, outlining the replies Kahn had received from banks in his survey, and a third article dealt with the experiences of Kahn's son in conducting his survey.

Kahn's column became an issue in the 1974 gubernatorial primary, leading to an inference that any UPL enforcement undertaken prior to the taxpayers' suit by the former Controller was for political reasons only.

Shortly before the 1974 gubernatorial election, allegations of improper charges imposed by banks on dormant accounts were brought to public light. The alleged failure of Houston Flournoy, a candidate for governor, and then the Controller, to enforce the UPL was developed into a political issue. A report prepared by the office of the Auditor General at the request of the Joint Legislative Audit Committee concluded the office of the State Controller had not effectively enforced the UPL since 1959. The Controller (Flournoy) responded, citing a lack of budgetary resources and staff as reasons for the dearth of enforcement.

However, in subsequent years, enforcement of the UPL increased substantially as did the Controller's staff. Since 1977, more than 50 audits of dormant accounts have been concluded.

The Controller makes a variety of related arguments, principally that the UPL had been enforced since its enactment to the extent permitted by law; the argument flies in the face of the evidence and the trial court's finding that he had not. He contends the trial court's finding violates the notion of separation of powers and is not supported by the evidence. The argument is made that the trial court's finding amounts to no more than a judicial statement the court was not satisfied with the manner or extent of the efforts made to enforce the UPL, and that the judiciary has no right to compel a state official to perform his duty in a certain manner. (*Zetterberg* v. *State Dept. of Public Health* (1974) 43 Cal.App.3d 657, 662 [118 Cal.Rptr. 100].) The argument ignores the factual record. The taxpayers did not seek to compel the Controller to exercise his discretion in a certain manner, but rather simply sought to compel the Controller to perform the duty entrusted to him. (*People* v. *Horton* (1968) 264 Cal.App.2d 192, 196 [70 Cal.Rptr. 186]; *Terry* v. *Bender* (1956) 143 Cal.App.2d 198, 212 [300 P.2d 119].)

The Controller also contends the record supports his claim that he was enforcing the UPL to the extent possible under budget restrictions. We disagree; the evidence presented indicates budgetary restraints could not be blamed entirely for lack of enforcement. In its statement of intended decision, incorporated into the findings of fact and conclusions of law, the court made the following statement: "The essence of the Controller's inaction was the Controller's erroneous assumption that the Bank had some 'right' to service charge these accounts and it wasn't until jostled by the taxpayers' suit that the Controller began to effectively question that assumption. This is not to say that the neglect of the Controller and the Controller's staff was

in any way venal. Such neglect appears from the record to be based more on a lack of budgetary resources and the Controller's inactivity should be viewed in its historical perspective." The Controller argues by this statement, the trial court intended to absolve him of any wrongdoing and to ascribe his failing to budgetary problems. That contention cannot be harmonized with the overwhelming evidence to the contrary.

Although the Controller has been consistent in his advocacy that prior to 1974, the audit staff of the Controller's office was very small and unable to enforce the UPL to its full extent, the problems surrounding the UPL were not of the type to be cured exclusively by auditors; rather, they were legal and administrative in character, and could have been handled by personnel other than auditors.

In the mid-1960's, the Controller was aware Bank was not paying interest on dormant accounts, and smaller accounts were being cannibalized by service charges, and as a consequence not reported under the UPL. The Chief of the Division of Accounting and general supervisor of the administration of the UPL for the Controller testified he was uncertain what the phrase "service charges which may lawfully be withheld," as used in former section 1502,[8] meant. He discussed the matter with counsel for the Controller but failed to receive a legal opinion. As a consequence, the Controller did not challenge the Bank's position that signature cards constituted a contract allowing the imposition of service charges on dormant accounts. In 1972, the Controller sent a letter to Bank's counsel, requesting a copy of the contract relied on by Bank to impose service charges. He did not receive the requested information until 1975.

More importantly, the Controller failed to enact any regulations concerning the UPL until 1974. A member of the Auditor General's staff testified that such regulations were necessary as the basis for banks to adequately comply with the statute, and for the auditors involved in audits of the banks' operations. The report prepared by the Auditor General in 1974 concluded the lack of regulations had fostered inconsistencies in operations.

Prior to 1967, the office of the Controller had made a decision not to establish a compliance program for the UPL until the outcome of the litigation in *Bank of America* v. *Cranston, supra,* 252 Cal.App.2d 208, even though the validity of the UPL was not drawn into question in that litigation. A summary judgment was obtained against Bank in 1967, but was not enforced until 1975.

---

[8]Former section 1502 was amended and renumbered section 1513 by Statutes of 1968, chapter 356, section 12.

The totality of the evidence supports the trial court's finding that the Controller's office had not *effectively* enforced the UPL prior to the taxpayers' suit.

The Controller also contends the trial court abused its discretion in denying his motion for a new trial. He claims he had no notice of the taxpayers' intention to introduce evidence he was not taking the proper steps to reunite the owners of dormant accounts with their property once the funds had been received by the state, thus resulting in surprise. (§ 657.) As a result of the taxpayers' assertion, the Controller was ordered to take all steps necessary to ascertain the identity of the owners. The trial court denied Controller's motion. The court found the question of his effort to reunite the owners with their property was within the framework of the pleadings and to the extent the Controller was surprised, his asserted surprise was not reasonable. ■ The trial court's ruling followed the dictates of established law that pleadings are to be liberally construed with a view toward substantial justice between the parties. We have reviewed the taxpayers' complaint and conclude that although it makes specific allegations on the Controller's failure to enforce the UPL against the banks, the general impact of the complaint was that the Controller was not enforcing the UPL at all.

■ Whether a motion for new trial is granted or denied rests in the discretion of the trial court and will be reversed on appeal only upon a strong affirmative showing of abuse of discretion. (*Morris* v. *Frudenfeld* (1982) 135 Cal.App.3d 23, 38 [185 Cal.Rptr. 76].) We fail to find an abuse of discretion.

■ The Controller also contends there is an absence of evidence to support the judgment which ordered him to secure the names and addresses of the owners of all dormant accounts and items received by him since September 5, 1974; he asserts the taxpayers failed to show he was not taking such steps and that the names and addresses in fact are available.

The senior vice-president and controller of the Bank testified that until 1974, all signature cards were retained for 25 years. After 1974, the retention schedule was reduced to seven years. The president of the Bank testified Bank has records of the names of dormant account owners, which are periodically reviewed.

Most illuminating is the testimony of the Chief of the Division of Unclaimed Property for the Controller's office. He testified that Security Pacific Bank entered into a settlement with the Controller regarding unclaimed property in the amount of $2.8 million, but did not turn over the names of the account owners with the settlement. When asked if he knew if any letters

had been sent to Security Pacific depositors to notify them of the settlement, he replied in the negative, followed by the somewhat incredulous statement that in fact no one in his office would know if letters had been sent. He also testified his office did have records by which it could be ascertained if addresses had been supplied by other banks which had settled, but after claiming to be custodian of the records for the office, stated he didn't know if such records exist.

The evidence is not only sufficient, it compels the trial court's order. The duty of the Controller does not end when funds are obtained from the holder; an attempt must be made to reunite the owners with their property. (*Douglas Aircraft Co.* v. *Cranston, supra,* 58 Cal.2d at p. 463.) Obviously, this task would be difficult if not impossible unless the Controller asserted his statutory power and compelled holders (banks) to furnish the names and addresses of depositors.

■ Finally, the question of the award of fees is unusual in that a common fund was created as the result of a taxpayer's action. Generally, taxpayers' suits result in the vindication of an important public right, but do not result in the creation of a fund. (See, e.g., *Starbird* v. *City of San Benito* (1981) 122 Cal.App.3d 657 [176 Cal.Rptr. 149]; *Rich* v. *City of Benicia* (1979) 98 Cal.App.3d 428 [159 Cal.Rptr. 473]; *Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988 [165 Cal.Rptr. 514]; *Mandel* v. *Lackner* (1979) 92 Cal.App.3d 747 [155 Cal.Rptr. 269].) In contrast, common funds usually arise out of class actions, estate, or stockholders' derivative suits. (See, e.g., *Melendres* v. *City of Los Angeles* (1975) 45 Cal.App.3d 267 [119 Cal.Rptr. 713]; *Mann* v. *Superior Court* (1942) 53 Cal.App.2d 272 [127 Cal.Rptr. 970]; *Estate of Ott* (1979) 99 Cal.App.3d 605 [160 Cal.Rptr. 402].)

■ The common fund exception to the traditional rule regarding court ordered attorney fees (see § 1021) "is grounded in 'the historic power of equity to permit the trustee of a fund or property, or a party preserving or recovering a fund for the benefit of others in addition to himself, to recover costs, including his attorneys' fees, from the fund of property itself or directly from the other parties enjoying the benefit.' [Citation.]" (*Serrano* v. *Priest* (1977) 20 Cal.3d 25, 35 [141 Cal.Rptr. 315, 569 P.2d 1303].) In order for a court to award fees under this theory, it is essential a certain or easily calculable sum or fund has been created by the litigation. (*Ibid.*)

Section 1021.5, a codification of the private attorney general doctrine developed in prior judicial decisions (*Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 935 [154 Cal.Rptr. 503, 593 P.2d 200]), requires consideration of whether: "(1) plaintiffs' action 'has resulted

in the enforcement of an important right affecting the public interest,' (2) 'a significant benefit, whether pecuniary or nonpecuniary has been conferred on the general public or a large class of persons' and (3) 'the necessity and financial burden of private enforcement are such as to make the award appropriate.'" (*Ibid.*) The basic difference between the two make that portion of the judgment confusing. It states the requirements of section 1021.5 have been met but states the requirements of the common fund doctrine have also been met and orders the fees be paid from that fund.

The court explained its reasoning at a post trial hearing. "Now, with respect to the motion, with respect to the source of payment or the basis for the payment of attorneys fees, at the time the Court rendered its Intended Decision and the time the Court finally settled these Findings of Fact and Conclusions of Law and entered the judgment in this matter, the Court did not know, one, how much money there was going to be, . . . and two, how many names and addresses the Controller is going to obtain from these other sources, and how many names and addresses it's going to obtain from the Bank of America with respect to the money that the Bank is accounting for.

"The Court agrees with taxpayers' attorney that the basic thrust of the Court's ruling with respect to the payment of attorneys fees is from the Common Fund.

"However, if that Fund were inadequate to pay back to the owners of the fund the money that they had in that Fund and at the same time pay whatever attorneys fees this Court ends up requiring to be paid to the taxpayers' attorneys, then, it would appear to the Court that 1021.5 would apply, and that in the interests of justice those payments should not be made out of the Common Fund, [and] should, in the interests of justice, be paid out of the recovery, if any."

The error in the trial court's reasoning was its belief the fund could be reduced by claims to the extent the fund remaining would be inadequate to pay the award of attorney fees. ▇▇▇ The bases of the common fund doctrine are "[f]airness to the successful litigant, who might otherwise receive no benefit because his recovery might be consumed by the expenses; correlative prevention of an unfair advantage to the others who are entitled to share in the fund and who should bear their share of the burden of its recovery; and encouragement of the attorney for the successful litigant, who will be more willing to undertake and diligently prosecute proper litigation for the protection or recovery of the fund if he is assured that he will be promptly and directly compensated should his efforts be successful." (*Estate of Stauffer* (1959) 53 Cal.2d 124, 132 [346 P.2d 748]; *Melendres* v. *City of Los Angeles, supra,* 45 Cal.App.3d at p. 273.) ▇▇▇ Those benefiting

from the recovery of the fund, in this case some depositors and eventually the People of the State of California, must bear their share of the cost of litigation. Fees for taxpayers' attorneys will be deducted from the judgment, and each claimant's share reduced proportionately. To the extent the judgment relies upon section 1021.5 for recovery of attorney fees, it must be modified to confine the award of fees to the common fund theory.

Additionally, the Controller contends the taxpayers are entitled to fees only to the extent they succeeded in creating a larger fund by arguing no service charges should be permitted. He persists in his argument that taxpayers' counsel was unnecessary at trial, as the Attorney General represented the depositors and the People of California in the action against Bank. The argument is at best specious. Taxpayers were the moving force behind the entire action against Bank and the Controller. As taxpayers, they had a justifiable interest in money belonging to the state. (*Farley* v. *Cory, supra,* 78 Cal.App.3d at p. 589.) The fact the Controller, once alerted to his shortcomings, vigorously began a system of enforcement after years of laxity, cannot now be relied upon to deny taxpayers' payment for their effort. A similar argument was recently rejected in *State of California* v. *County of Santa Clara* (1983) 142 Cal.App.3d 608 [191 Cal.Rptr. 204]. There, two individuals filed an action seeking declaratory relief and mandamus against the County of Santa Clara for failing to place their property in a timberland preserve zone. The county justified its action by relying upon an ordinance passed shortly after the individuals had petitioned for the zoning. Five months later, the state brought an action to declare the ordinance invalid. On appeal, the county argued the individuals were not entitled to attorney fees, as the Attorney General had brought an action to enforce the Forestry Act they relied upon. The court rejected the argument, stating, "The record shows that the State did not file its complaint for declaratory relief until October 1980. The only issue raised in its complaint was whether the County's requirement of a use permit was valid under the FTRA. The Walshes, after being denied a TPZ, filed their complaint to force the County to comply with its statutory duties nine months earlier. Their complaint galvanized the County to enact its ordinance in June 1980, three years after the statutory deadline to do so. (Gov. Code, § 51113, subd. (c).) Because they did not believe the ordinance was in line with the statute, the Walshes amended their original complaint, encouraged the State's action, and secured consolidation of the two. The Walshes, in other words, were the moving force in securing benefits which, obviously, they desired, but which the County had a statutory duty to provide for the good of the general public." (*Id.,* at p. 615.)

The Controller also strenuously argues the taxpayers should be precluded from an award of attorney fees under the authority of *Westside Community*

*for Independent Living, Inc.* v. *Obledo* (1983) 33 Cal.3d 348 [188 Cal.Rptr. 873, 657 P.2d 365]. That case is factually inapposite. There, an organization filed a petition for writ of mandate, asking the court to order the secretary of the health and welfare agency to issue regulations implementing section 11135 of the Government Code, as he was required to do under section 11139.5 of that code. At the time the petition was filed, the secretary had already approved a final draft of the proposed regulations, and was proceeding in a manner as expeditious as possible given the procedural guidelines applicable to enacting regulations. (*Id.*, at p. 353.) The Supreme Court held the organization was not entitled to attorney fees under section 1021.5, as there was no causal connection between its petition and the drafting of the regulations. In the matter before us, the Controller began *effective* enforcement of the UPL only after taxpayers filed their action, thus establishing a causal connection.

DEPOSIT OF FUNDS WITH THE COUNTY CLERK

Finally, the Controller contests the validity of that portion of the judgment ordering Bank to pay to the clerk of the superior court all sums due after the accounting is accomplished. He argues the sums due have escheated to the state, and under sections 1530 and 1532, must be paid directly to him. The argument is meritless. Had the funds been collected without litigation, he would have been correct. Because of the Controller's inaction, it was necessary for the taxpayers to resort to the courts to secure those funds which should have been deposited with the state. The sums must be paid by Bank as the result of a judgment following extensive litigation; those funds are subject to payment of attorney fees pursuant to the court order prior to delivery to the state.

DISPOSITION

In No. 257509, insofar as the judgment holds the Controller is not barred by a statute of limitations in the enforcement of the UPL, it is affirmed, and is reversed as to the award of interest and damages under Government Code section 12419; the award of prejudgment interest is modified to provide for prejudgment interest at the rate of 7 percent per annum on funds reportable and payable for the years 1959 through and including 1976. The judgment is modified to award the Controller interest at the rate of 12 percent for all sums due, payable, and owing as of January 1, 1977, and thereafter.

In No. 250500, the judgment is modified to award the taxpayers attorney fees on the basis of the common fund doctrine only.

In all other respects, the judgment is affirmed. The parties shall bear their own costs.

Puglia, P. J., and Regan, J., concurred.

Petitions for a rehearing were denied February 22, 1985, and the opinion was modified to read as printed above.